STATE

v.

**Bradley C. PETERSON.**

No. 96–330–C.A.

Supreme Court of Rhode Island.

Nov. 23, 1998.

Annie Goldberg, Aaron L. Weisman, Providence, for plaintiff.

Paula Rosin, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of Bradley C. Peterson from a judgment of conviction of robbery in the second degree entered in the Superior Court. After a jury trial, the defendant was sentenced to thirty years, twenty years to serve, ten years suspended and probation, and a consecutive five-year term of imprisonment as an habitual offender. For the reasons that follow, we affirm the judgment of the Superior Court. The travel and facts of the case insofar as pertinent to this appeal are as follows.

Indictment No. N1/93–240A charged Bradley C. Peterson (Peterson or defendant) with the crime of robbery in the second degree, in violation of G.L.1956 § 11–39–1. On November 10, 1993, the Department of the Attorney General filed a notice of its intention to have Peterson declared an habitual offender, pursuant to G.L.1956 § 12–19–21. Originally, trial commenced in May of 1994, but a mistrial was declared. His second trial commenced on February 6, 1995. On February 14, 1995, the jury returned a verdict of guilty. On March 1, 1995, Peterson's motion for a new trial was denied, and he was found to be an habitual offender. On April 19, 1995, he was sentenced to thirty years on the robbery conviction—twenty years to serve, ten years suspended—and probation. The trial justice imposed a consecutive fifteen-year term of imprisonment as an habitual offender. On December 5, 1995, the sentence imposed on the habitual offender conviction was reduced to five years, to be served consecutively to the twenty-year sen-

tence imposed on the robbery conviction. On April 26, 1995, a notice of appeal was filed.

On March 18, 1993, at around 1:45 a.m., the complaining witness, Joseph Kaiser (Kaiser), had finished working the last shift at the Starboard Tack in Middletown as a part-time bartender, and was driving his 1985 blue and white Chevrolet Blazer truck to his Newport home located at 53 Gould Street. He was driving at approximately ten miles per hour, because weather conditions were snowy and icy, when suddenly he saw a male pedestrian enter the roadway directly in front of him. He applied his brakes bringing the truck essentially to a halt; simultaneously the male pedestrian put his hands out in front of him, put them on the hood of Kaiser's truck, spun off in a kind of pirouette, and lay face-down on the sidewalk approximately six to ten feet away.

Kaiser, an Army medic who oversees an emergency room conducted by the Army Reserves and works as a paramedic with the Middletown Fire Department, doubted that he had struck and injured the pedestrian. Consequently he stepped out of his truck, leaving the driver's door open, and called out for the pedestrian to get up. Initially there was no response, but after Kaiser called out a third time, the man got up, brushed himself off, and ran straight towards Kaiser. The man grabbed Kaiser's lapels. Kaiser demanded, "What the hell are you doing?" The man replied, "I'm stealing your truck." To which Kaiser responded, "*** you." "I got a gun" said the man. Kaiser responded, "I don't care." They continued to struggle face-to-face inches from one another for less than two minutes. After pushing Kaiser to the ground, the man stole his truck as Kaiser watched.

Kaiser made his way home and immediately contacted Newport police, who came to his home and took an oral statement. The next day, Kaiser gave a formal statement at police headquarters and the truck was found abandoned in Providence. When Kaiser went to claim the truck from the towing lot, he noticed a number of items were missing, including a Realistic microphone, a box of collectible antique U.S. Army ammunition

with distinctive markings, and a Sony AM–FM disc player.

Meanwhile, approximately two days after the carjacking, Peterson returned home to his three children and their mother, his live-in girlfriend Susan Rosa (Susan), who ultimately testified against him. Susan asked Peterson where he had been. She testified that Peterson told her the following narrative. On the morning of March 18, 1993, he was walking in Newport when he saw a four-by-four blazer and pretended to hit it. When the driver got out of the truck Peterson beat him, carjacked the vehicle, and took it to Providence. The truck contained a CD, flare, car phone, camera, and some bullets. Susan stated that she discovered some bullets, a microphone, and guns hidden underneath her kitchen cabinet.

Susan further testified that on April 8, 1993, she, the children, and Peterson went to Ames Department Store in a rented minivan. She and Peterson began arguing. He abruptly left with the children and told her he wasn't coming back. After waiting two-and-one-half hours, she contacted the Middletown Police. The officer who responded to the call happened to be Frank Lima, whom Susan described as her best friend throughout her high school years. Susan confided to Officer Lima what Peterson had told her about the carjacking, but requested that her identity be kept confidential because she did not want her life to be put in danger.

Peterson was arrested that same day, on an outstanding domestic assault warrant. He was photographed and held until Kaiser could be brought in for an identification. On April 9, 1993, Kaiser identified Peterson from a photographic array presented to him by the police. On September 27, 1994, Susan went to the Newport Police Department to give a formal statement regarding Peterson's account given to her about the carjacking. She brought with her ammunition, guns, and a microphone. On February 13, 1995, Susan testified at trial that she was pregnant, and that she had a new boyfriend. She further testified that she had been motivated to give a formal statement and to furnish evidence on September 27, 1994, because Peterson had been responsible for the crime and had been

harassing her. Consequently, she wanted to make sure that he remained in jail.

In support of his appeal, defendant raises two issues. First, defendant contends his constitutional rights were violated as a result of the trial justice's limitation upon defense counsel's cross-examination of Susan. Specifically, he contends that he was prevented from inquiring whether Susan and her new boyfriend conspired to frame defendant. He argues that he was not allowed to cross-examine Susan concerning correspondence that she allegedly wrote to Peterson in order to impeach her testimony that some of Peterson's friends had been harassing her. Second, defendant claims that the state failed to file timely notice of its intent to seek an adjudication pursuant to the habitual offender statute. Additional facts, as may be necessary to our discussion of the issues, will be supplied.

Limitation of Cross–Examination

Peterson's contention on appeal is that his constitutional rights were violated because he was not permitted to delve into Susan's relationship with another man. He argues that such exploration may have revealed that Susan might have had a motive to lie, and that she and her lover were engaged in a conspiracy to frame Peterson. Peterson alleges that Susan had a relationship with a man at the Adult Correctional Institutions (ACI) who had written a threatening letter to the trial justice and, when confronted by the police, claimed that Peterson was the author.[1] Defense counsel stated that he was "pretty sure" that Susan's new boyfriend was that same inmate at the ACI who had written the letter. In his offer of proof he told the court that he had "a letter from [a] person at the ACI who says Susan is his woman and that he would kill [Peterson] if [Peterson] ever says anything to her." Further, counsel claimed to have a letter allegedly written by Susan to Peterson relating that a friend of Peterson had visited Susan and it was a positive experience for her.

The trial justice limited defense counsel's questioning of Susan along the lines of her relationship with her new boyfriend. How-

ever, he permitted defense counsel to establish that Susan had a new boyfriend, that she was pregnant, and that she wanted Peterson to remain in jail. Additionally, the trial justice permitted defense counsel to establish by cross-examining Susan that only some, and not all, of Peterson's friends harassed her, and that Susan's testimony might be in retaliation for Peterson's allegedly reporting Susan to the Department of Children, Youth, and Families (DCYF). We sustain the trial justice's ruling on cross-examination.

"Effective cross-examination is an essential element of the presentation of a full and fair defense and is guaranteed by both the State and the Federal Constitutions." *State v. Doctor*, 690 A.2d 321, 327 (R.I.1997) (quoting *State v. Veluzat*, 578 A.2d 93, 94 (R.I.1990)); *see also In re Douglas L.*, 625 A.2d 1357, 1360–61 (R.I.1993). Moreover, "the cross-examiner must be given a reasonable opportunity to explore and to establish any possible bias, prejudice, or ulterior motive that a witness may possess that might affect the witness' testimony." *Veluzat*, 578 A.2d at 94–95. However, the scope of cross-examination is not unlimited. *Id.* at 95. Questions that exceed the proper scope of cross-examination are those that harass, annoy, or humiliate the witness, or questions that are irrelevant or contain no probative value. *State v. Eckhart*, 117 R.I. 431, 436, 367 A.2d 1073, 1076 (1977). Questions of this type are subject to exclusion in the sound discretion of the trial justice. *State v. Anthony*, 422 A.2d 921, 924 (R.I. 1980). The exercise of that discretion will not be disturbed absent a showing of clear abuse, and then only when such abuse constitutes prejudicial error. *Id.; see Doctor*, 690 A.2d at 327. This Court has stated previously that in order to ensure that the defendant receives a fair trial, the trial justice must permit "reasonable latitude" on cross-examination, including "an opportunity for a defendant to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case being tried." *Anthony*, 422 A.2d at 924. We believe reasonable latitude was provided in this case.

1. The judge had in fact received a threatening letter. The state police determined that the true author had wrongly accused Peterson as being the author.

After careful review of the record, we are unable to conclude that the trial justice erred by limiting Susan's cross-examination regarding an alleged relationship with an ACI inmate, as well as with respect to correspondence, allegedly written by Susan, revealing that visits from some of Peterson's friends constituted a positive experience.

Susan was asked specifically on cross-examination whether she was pregnant and whether she turned over the "evidence because [she] wanted to make sure [Peterson] did not get out of jail." She responded, "yes," to both questions. She was asked whether she "wanted to get [Peterson] out of [her] life because [she] now had a new boyfriend" and whether she received the "evidence [she] gave the police from [her new] boyfriend." She responded, "no," to both questions. Further, she was asked whether "all the calls [she] received from friends of *** Peterson were *** calls that bothered and harassed [her]?" She responded, "not all of them." The trial justice reasoned that further inquiry into Susan's relationships was unwarranted. However, he did not foreclose the defense from making inquiry into Susan's motive or bias. Again, Susan admitted that she was pregnant, had a new boyfriend, that she wanted Peterson to stay in jail and out of her life, and that only some of Peterson's friends had made harassing calls. The trial justice even permitted defense counsel to attempt to establish that Susan's testimony was motivated out of animus towards Peterson for allegedly reporting her to DCYF. We believe counsel was afforded ample opportunity and reasonable latitude to persuade the jury that Susan was not disinterested. As we stated previously, the scope of cross-examination, even for the purpose of exposing bias or motive, is not unlimited.

The defendant points to this Court's decision reversing a defendant's conviction in *State v. Texter*, 594 A.2d 376 (R.I.1991), to support his contention that the trial justice improperly restricted Susan's cross-examination. In that case, the defense sought to elicit testimony that Texter had accused the complainant's husband of stealing charitable donations and had threatened to report him in order to show that the complaining witness and her husband held a grudge against Texter and had a reason to fabricate the charges against him. This Court concluded that the inquiry should have been allowed because it "[had] a tendency to make the existence of any bias or motive harbored by the victim and her husband more or less probable than it would be without such evidence." *Id.* at 378. Further, the jury had heard testimony during the trial that the victim and her husband did not have an ax to grind in respect to Texter, and they did not fabricate the complaint. *Id.* We are not persuaded that the instant case is controlled by our holding in *Texter*.

In the case at bar, counsel for the defendant was allowed to explore the issues of bias sufficiently to satisfy the mandate of *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The trial justice limited the cross-examination within the bounds of relevance. In doing so, he neither violated the constitutional right of the defendant nor did he exceed his discretionary power to determine relevance.

As we have observed already, counsel for the defendant was given reasonable latitude to explore the element of bias. Obviously, such latitude may be circumscribed as we have pointed out in *Anthony*, 422 A.2d at 924. The evidence of guilt in this case was overwhelming. We are convinced that even allowing counsel for the defendant the privilege of unlimited cross-examination on the subjects of his choice would have had no effect on the outcome of this trial.

### The Charge of Habitual Offender

■ We now turn to the issue of whether the state failed to file timely notice of its intent to seek an adjudication pursuant to the habitual offender statute, § 12–19–21. The defendant was arraigned on July 22, 1993, and a pretrial conference was scheduled for September 2, 1993. This conference was cancelled, due to defendant's difficult relationship with attorneys who were appointed to represent him, and rescheduled for November 18, 1993. The state filed its habitual offender notice on November 10, 1993. The defendant argued before the trial justice that pursuant to the statute, the state was re-

quired to provide notice within forty-five days of the arraignment date, or by the date set at arraignment for the pretrial conference, September 2, 1993. The state argued that oral or written notice of intent to proceed under the statute may be given within forty-five days of the arraignment, but in no case later than the date a pretrial conference is held. The trial justice concluded the following:

"I find that no harm or prejudice prior to trial resulted from the late filing, assuming I make that finding and I don't because Mr. Peterson was well aware of the State's intention to pursue the Habitual Criminal Statute proposition. \*\*\* I am going to make a finding that the pretrial conference date was 11–18–93, because it was continued on many occasions \*\*\* my experience with this case was that Mr. Peterson had requested the removal of a number of attorneys who were supportive of being removed because of Mr. Peterson's conduct to them. \*\*\* I'm satisfied that the pretrial conference date was finally set at 11–18–93 which was subsequent to the time of the filing of the notice [and] that at that time the case was passed for trial."

2. General Laws 1956 § 12–19–21 provides:

"Habitual criminals.—(a) If any person who has been previously convicted in this or any other state of two or more felony offenses arising from separate and distinct incidents and sentenced on two or more such occasions to serve a term in prison shall, after the convictions and sentences, be convicted in this state of any offense punished by imprisonment for more than one year, such person shall be deemed an 'habitual criminal.' Upon conviction, the person deemed an habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted. No conviction and sentence for which the person has subsequently received a pardon granted on the ground that he or she was innocent, shall be considered a conviction and sentence for the purpose of determining whether the person is an habitual criminal.

(b) Whenever it appears a person shall be deemed an 'habitual criminal,' the attorney general, within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference, may file with the court, a notice specifying that the defendant, upon

"It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *State v. DiCicco,* 707 A.2d 251, 253 (R.I.1998) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I. 1996)). When confronted with an unambiguous statute, we must apply the statute as written. *DiCicco,* 707 A.2d at 253. When confronted with an unclear or ambiguous statute, there is room for statutory construction and we examine the statute in its entirety in order to "glean the intent and purpose of the Legislature." *In re Advisory to the Governor,* 668 A.2d 1246, 1248 (R.I.1996). In so doing, "[t]his court will not construe a statute to reach an absurd result." *Kaya v. Partington,* 681 A.2d 256, 261 (R.I.1996) (citing *Beaudoin v. Petit,* 122 R.I. 469, 476, 409 A.2d 536, 540 (1979)).

A reading of § 12–19–21(b)[2] reveals that "the attorney general, within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference, may file with the court, a notice specifying that the defendant, upon conviction, is subject to the imposition of an additional sentence."

conviction, is subject to the imposition of an additional sentence in accordance with this section; provided, however, that in no case shall the fact that the defendant is alleged to be a habitual offender be an issue upon the trial of the defendant, nor shall it be disclosed to the jury. Upon any plea of guilty or nolo contendere or verdict or finding of guilty of the defendant, a hearing shall be held by the court sitting without a jury to determine whether the person so convicted is a habitual criminal. Notice shall be given to the defendant and the attorney general at least ten (10) days prior to the hearing. Duly authenticated copies of former judgments and commitments which comprise the two or more prior convictions and imprisonments required under this section shall be prima facie evidence of defendant's former convictions and imprisonments. If it appears by a preponderance of the evidence presented that the defendant is a habitual criminal under this section, he or she shall be sentenced by the court to an additional consecutive term of imprisonment of not exceeding twenty-five (25) years; and provided further, that the court shall order the defendant to serve a minimum number of years of the sentence before he or she becomes eligible for parole."

We are of the opinion that the construction urged by the defendant could lead to results not intended by the Legislature. The state should not be deprived of its statutory right to seek enhanced sentencing merely because a pretrial conference is continued. It is clear that the Legislature intended no such interpretation of the statute. Therefore, we conclude that it is unnecessary to belabor an interpretation of the statute's language. The language contained in § 12–19–21 clearly articulates the plain meaning of the statute. Accordingly, we are in agreement with the trial justice's finding that notice was timely, and that no harm or prejudice in respect to the habitual criminal charge resulted to the defendant.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed, and the papers in the case may be remanded to the Superior Court.

FLANDERS, Justice, concurring.

I agree with the Court's conclusion that we should affirm the judgment in this case. I also agree with its analysis of the limitation of cross-examination issue and its determination that "no harm or prejudice in respect to the habitual criminal charge resulted to the defendant." I also believe, however, that Justice Goldberg's interpretation of the habitual-offender statute is sound. It appears to me that this statute, G.L.1956 § 12–19–21(b), which requires the Attorney General to file the requisite notice with the court "within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference" means that the Attorney General has up to forty-five days to file this notice, unless the pretrial conference occurs before the expiration of the forty-five-day period. In this latter event, the statute requires the Attorney General to file the notice not "later than the date of the pretrial conference."

A contrary reading of this statute—that is, one that would always allow the Attorney General to file such notice not "later than the date of the pretrial conference"—even when that conference occurs after the forty-five-day period has already expired—effectively reads the forty-five-day period right out of the statute. If the General Assembly had intended this result, then it would have left out any reference to filing the notice within a forty-five-day period and simply stated that the Attorney General had to do so "before or in no case later than the date of the pretrial conference." But this is not how the General Assembly worded the statute.

It is a fundamental canon of statutory interpretation that a court must give effect to every word and every phrase in a statute according to its plain and ordinary meaning whenever it is possible and/or rational to do so. See Providence Journal Co. v. Rodgers, 711 A.2d 1131, 1134 (R.I.1998) (stating that when a court examines the language of a statute that is clear and unambiguous, it must interpret the statute literally and give the words their plain and ordinary meanings); Conrad v. Town of Narragansett Board of Canvassers, 420 A.2d 50, 52 (R.I. 1980) ("[E]ach 'word, sentence, or provision of a statute was intended for some useful purpose and has some force and effect.' ") (quoting Merciol v. New England Telephone & Telegraph Co., 110 R.I. 149, 153, 290 A.2d 907, 910 (1972)); 2A Norman J. Singer, Sutherland Statutory Construction § 46.06, at 119 (5th ed.1992). Only by interpreting this statute to require the state to file the requisite habitual-offender notice before the expiration of the forty-five-day period following the arraignment, or no later than the date of the pretrial conference, whichever occurs first, can we give meaning and effect to each word and phrase in the statute. Accordingly, for these reasons, I join in Justice Goldberg's interpretation of the habitual-offender statute.

Nonetheless, I agree with the Court's decision to affirm the trial justice's ruling on this point because I do not believe that defendant suffered any prejudice in this case as a result of the state's late filing of the habitual-offender notice. The grand jury returned the indictment here on July 16, 1993; defendant was arraigned in Superior Court on July 22; the forty-five-day period expired on September 5; the Attorney General filed with the court its notice of intention to present defendant for sentencing as a habitual offender on November 10; the pretrial conference oc-

curred nine days later on November 19; and the trial did not proceed until some fifteen months after the notice was filed.

Under these circumstances, defendant "was in no way harmed or prejudiced by the lack of a documentary filing on the part of the state" within the period called for by the habitual-offender statute. *State v. Tregaskis*, 540 A.2d 1022, 1025 (R.I.1988) (holding that the failure to file the written notice required by the habitual-offender statute within the time period prescribed did not deprive the trial court of jurisdiction to hear the state's habitual-offender petition, absent a showing of prejudice to the defendant).

Because defendant in this case was aware of the state's intention to pursue habitual-offender sentencing for more than one week before the pretrial conference occurred and, in any event, for some fifteen months before the trial occurred, it does not appear to me that defendant suffered any cognizable prejudice because of the state's technical noncompliance with the habitual-offender-notice deadline. *Cf. State v. Desrosiers*, 559 A.2d 641, 644 (R.I.1989) (refusing to vacate a probation-violation finding "because of technical noncompliance with" the notice provisions of Rule 32(f) of the Superior Court Rules of Criminal Procedure "when the defendant was in fact aware of the exact grounds for the alleged violation" in sufficient time to satisfy the dictates of due process).

Certainly, the defendant here had ample advance notice and opportunity to be heard after he became aware of the state's intentions with respect to the habitual-offender statute and therefore, I do not believe he has any colorable due-process complaint in this regard.

In sum, I believe that if the state intends to rely on the habitual-offender statute, then it is technically required to file the requisite notice with the court within a forty-five-day period after the arraignment or no later than the pretrial conference, if the latter date occurs before the forty-five-day period expires. However, in this case, I do not believe that the state's late filing of the notice after the forty-five-day period expired, but before the pretrial conference, caused this defendant to suffer any prejudice. Accordingly, I agree with the Court that the judgment here should be affirmed.

GOLDBERG, Justice, concurring in part and dissenting in part.

I am in full agreement with respect to the Court's opinion on the limitation that was placed on cross-examination. Regarding the Court's interpretation of G.L.1956 § 12–19–21, Rhode Island's habitual-criminal statute, however, I respectfully dissent. The critical facts to this issue are not in dispute.

In the early morning hours of March 18, 1993, defendant Bradley C. Peterson (Peterson) stepped in front of a slow-moving truck being driven by Joseph Kaiser (Kaiser). After Peterson apparently feigned injury, as discussed in the majority's recitation of the facts, a struggle ensued between Peterson and Kaiser, which culminated in Peterson's theft of Kaiser's vehicle. Peterson eventually was arrested, and on July 22, 1993, arraigned in Newport County Superior Court on one count of second-degree robbery. At the arraignment, a pretrial conference date of September 2, 1993, was scheduled, although the conference was continued until November 18, 1993. On November 10, 1993, eight days prior to the date of the actual pretrial conference, and a full one-hundred and eleven days after the arraignment, the Attorney General's office filed notice that upon conviction Peterson "is subject to the imposition of an additional sentence as an [*sic*] habitual offender."

Before the trial justice, Peterson argued that the habitual offender notice was untimely. Specifically, he maintained that pursuant to § 12–19–21, the state must declare its intention to seek an enhanced sentence within forty-five days of the arraignment, but in no case later than the scheduled pretrial conference date of September 2, 1993. On the other hand the state argued, and the trial justice eventually found, that notwithstanding the pretrial conference continuances, as long as the state provided notice before the date the pretrial conference was actually held (November 18, 1993), the requirements of § 12–19–21 were satisfied.

On February 14, 1995, the jury returned a guilty verdict on the charge of second-degree robbery, and on March 1, 1995, Peterson was declared a habitual criminal.[3] On April 19, 1995, Peterson was sentenced to thirty-years imprisonment on the robbery conviction, twenty years to serve and ten years suspended with probation. In addition, because of Peterson's status as a habitual criminal, the trial justice sentenced him to serve an additional fifteen years consecutive to the robbery charge. On December 5, 1995, the trial justice reduced the habitual criminal sentence to five years.

In pertinent part, Rhode Island's habitual-offender statute, § 12–19–21(b), states:

"Whenever it appears a person shall be deemed an [sic] 'habitual criminal,' the attorney general, *within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference,* may file with the court, a notice specifying that the defendant, upon conviction, is subject to the imposition of an additional sentence in accordance with this section." (Emphasis added.)

It is well settled that when the language of a statute is clear and unambiguous, this Court is obligated to interpret the statute literally and apply its plain and ordinary meaning. *See State v. DiCicco,* 707 A.2d 251, 253 (R.I.1998); *State v. LaRoche,* 683 A.2d 989, 997 (R.I.1996). Furthermore, "penal statutes must be strictly construed in favor of the party upon whom a penalty is to be imposed." *State v. Bryant,* 670 A.2d 776, 779 (R.I.1996) (quoting *State v. Calise,* 478 A.2d 198, 200 (R.I.1984)). With these well established principles in mind, I simply cannot agree with the majority that the Legislature intended to bestow upon the Attorney General's office the option of presenting notice either within forty-five days of the arraignment *or* at some point before the pretrial conference is held, particularly given that the pretrial conference routinely is scheduled *before* the expiration of the forty-five day period and is actually held at a later time only because it has been continued, often through the informal agreement of counsel.

This "either/or" interpretation contravenes the clear and unambiguous words of the habitual criminal statute. If the Legislature sought to achieve this "either/or" result, it easily could have utilized such words. To the contrary, the Legislature proscribed that "the attorney general, within forty-five (45) days of the arraignment, *but in no case later than* the date of the pretrial conference, may file [notice] with the court." Section 12–19–21(b). (Emphasis added.) The words "but in no case later than the date of the pretrial conference" are limited by the preceding words "within forty-five (45) days of the arraignment." In other words, the Attorney General's office may present notice within forty-five days of the arraignment, but not later than the pretrial conference, which may occur before the expiration of the forty-five day period. *See, e.g., State v. Heald,* 232 A.2d 79, 81 (Me.1967) (interpreting the phrase " '[a]ll motions for new trials in criminal cases *** shall be filed during the term at which verdict is rendered, *but in no case later than 30 days after verdict [is] rendered*' as meaning that the motion must be filed during the term and in the event the term continues for more than 30 days, then within 30 days after the rendition of the verdict").

Nevertheless, the majority reads the requirement that notice be presented "not later than the pretrial conference" as extending the time in which the state may provide notice and thus renders the forty-five day requirement nugatory. This interpretation, however, has the anomalous result that the granting of pretrial conference continuances, which previously were based upon informal procedure and brotherly courtesy, now have significant and substantive consequences for a defendant facing the most punitive weapon in the Attorney General's arsenal. *See State v. Humphrey,* 715 A.2d 1265, 1278 (R.I.1998) (augmenting habitual offender's sentence by twenty-five years); *State v. Sitko,* 457 A.2d 260, 261–62 (R.I.1983) (" 'The purpose of the habitual offender act is to allow enhanced penalties for those defendants who meet objective guidelines indicating recidivism' ").

---

**3.** The Attorney General's notice indicated that Peterson previously had been convicted of robbery in 1985 and possession of a stolen motor vehicle in 1990.

In this case, Peterson was arraigned on July 22, 1993. Consequently, the state was required to provide notice within forty-five days (September 6, 1993).[4] The state's failure to file notice until November 10, 1993, which was one-hundred and eleven days after the arraignment, was in contravention of the plain words of § 12–19–21 and violative of Peterson's due process rights. *See State v. Tregaskis*, 540 A.2d 1022, 1025 (R.I.1988) (oral notice provided at arraignment).

For the foregoing reasons, I would vacate the habitual criminal sentence.

---

**4.** I note that since Peterson was arraigned on July 22, 1993, the state was required to provide notice within forty-five days, which would have been September 5, 1993. Since September 5, 1993, fell on a Sunday, however, the state had until the end of the following day to provide notice. *See* Super.R.Crim.P. 45(a).