May 7, 2026

**Supreme Court**

No. 2024-323-C.A.
(N1/93-240A)

State                                    :

v.                                       :

Bradley Peterson.                        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Bradley Peterson. | : |

Present:  Suttell, C.J., Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The *pro se*[1] defendant, Bradley Peterson, seeks review of an adjudication of a probation violation that was entered after a hearing in the Providence County Superior Court on June 10 and June 11, 2024.  At the conclusion of that hearing, the hearing justice found that Mr. Peterson had violated the terms and conditions of his probation and ordered him to serve nine years of the remaining ten-year suspended sentence that had been imposed as a result of an earlier conviction.

---

[1]    We note that, during the pendency of this appeal, after initially having been represented by counsel, the defendant opted to proceed *pro se*.

On appeal, defendant contends that the hearing justice abused his discretion because, in defendant's view, the sentence imposed for the probation violation at issue was excessive.

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and after carefully reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

The factual background of this case is described in our opinion in *State v. Peterson*, 722 A.2d 259 (R.I. 1998), which dealt with the underlying conviction that relates to this case. Accordingly, we shall recount here only the facts necessary for our analysis of the issue relevant to this appeal.

In 1995, defendant was convicted by a jury of second-degree robbery. *Peterson*, 722 A.2d at 260. At that trial, the evidence showed that defendant had feigned being a pedestrian who had been struck by a truck driven by an Army medic. *Id.* at 261. After a struggle, during which defendant informed the victim that he had

a gun, defendant stole the victim's truck and later abandoned it in Providence. *Id.* Items were reported missing from the stolen truck, "including a Realistic microphone, a box of collectible antique U.S. Army ammunition with distinctive markings, and a Sony AM–FM disc player." *Id.*

Pursuant to that robbery conviction, he was sentenced to thirty years—twenty years of which were to be served, with ten years suspended—and probation. *Peterson*, 722 A.2d at 260. The defendant also received "a consecutive fifteen-year term of imprisonment as an habitual offender." *Id.* The trial justice subsequently reduced defendant's habitual offender sentence to five years, to be served consecutively to the twenty-year sentence. *Id.* at 260-61.[2]

On February 27, 2024, the state filed a notice of probation violation pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, alleging that defendant had not complied with a condition of his probation due to the fact that he had failed to keep the peace and be of good behavior. On June 10 and June 11, 2024, a probation violation hearing was held in the Superior Court. We recount below the salient aspects of that hearing.

---

[2] Subsequently, this Court affirmed the judgment of conviction of robbery in the second degree. *State v. Peterson*, 722 A.2d 259, 265 (R.I. 1998).

## A

### The Testimony of the Complaining Witness's Mother

The mother of the complaining witness was the first witness called to testify. The complaining witness's mother testified that she currently lives in Pennsylvania, as she did at the time of the events at issue. She stated that, on February 20 and 21, 2024, she received a "very disturbing" voice message[3] from an unknown number mentioning her daughter's name, which prompted her to call the Pennsylvania State Police and to file a report. She further testified that, after having received a total of three phone calls, she "blocked the number." It was the testimony of the complaining witness's mother that she found it disturbing that someone was calling her phone number looking for her daughter, who was in Rhode Island and not Pennsylvania.

## B

### The Testimony of the Complaining Witness

The complaining witness was the next witness called to testify. She testified that, as of the time of the hearing, she had been employed as a television news reporter and anchor for approximately three years. The complaining witness stated that she had previously lived at 75 South Union Street in Pawtucket, Rhode Island,

---

[3] The recording of the voice message was entered into evidence as a full exhibit, and it was played at the hearing in its entirety.

at an apartment complex called Slater Cotton Mill. She testified that, in February of 2024, while her lease at Slater Cotton Mill was still active, she moved to a different apartment. She added, however, that she would occasionally return to Slater Cotton Mill to retrieve some personal belongings.

The complaining witness testified that, on February 21, 2024, her mother called her to inform her that someone calling from a New Hampshire phone number had been attempting to contact her. She added that, after she had spoken by phone with her mother, she received a phone call from one Nicole Zillich, the property manager at the Slater Cotton Mill apartment complex. The complaining witness stated that, after she spoke with Ms. Zillich (*see infra*), she became concerned about her safety, and she called both the Pawtucket Police Department and the Bristol Police Department. She also stated that Ms. Zillich had sent her photographs of the person trying to get in touch with her.

The complaining witness testified that, on the morning of February 24, 2024, she woke up and saw that she had received multiple missed calls and voice messages "from a number that showed up at the Slater Cotton Mill."[4] The complaining witness added that she turned over to the Bristol Police Department as well as to the Attorney

---

[4] The complaining witness had previously testified that, if someone was physically outside the apartment complex seeking to get into her apartment, she would receive a notification of the fact on her cell phone.

General's office the "screen shots" of the calls and the recordings from the voice messages.[5] She acknowledged that the person who left the voice message said: "It's Brad."

It was the complaining witness's further testimony that Ms. Zillich sent her photographs of a person holding up a sign at the Slater Cotton Mill apartment complex on February 24. She stated that she did not recognize the person in the photographs but that the photographs appeared to depict the same person as was depicted in the photographs that Ms. Zillich had sent on February 21. The complaining witness noted that she immediately turned those photographs over to the Bristol Police Department. She additionally stated that, after becoming aware of the just-described information on February 24, she felt "terrified" and "shocked."

According to the complaining witness, the various attempts to contact her altered the way she proceeded with her life. She explained that she did not feel "comfortable doing [her] job, going anywhere, [or] to tell anyone where [she] was * * *." She further noted that, because she was uncomfortable, she "stopped a lot of [her] daily routine" and that it had caused her to feel "uneasy to do everyday life things * * *." The complaining witness testified that, after she listened to the voice messages, she was in fear for her life and her safety. When asked how she felt when

---

[5] The recordings of the voice messages were fully played and were entered into evidence at the hearing.

the caller on the voice messages said he loved her, she responded that she felt nauseous because she did not know who the person was.

The complaining witness testified that she became aware that, on February 26, 2024, "Bradley Peterson was arrested for these incidences." She added that, after learning of the arrest, she went through her work e-mails and found an e-mail from someone identified as Bradley Peterson, which she printed and turned over to the Bristol Police Department and the Attorney General's office. The complaining witness indicated that she had responded to that e-mail (as she normally did when viewers of her televised broadcasts would reach out to her) but that she did not respond to any additional e-mails from defendant after that initial communication.[6] The complaining witness testified that those additional e-mails caused her to be further concerned for her safety.

## C

### The Testimony of Nicole Zillich

Ms. Zillich testified that she is employed by Dalkey Management and that she is the senior property manager of Slater Cotton Mills. She testified that, on the morning of February 21, 2024, she arrived at the Slater Cotton Mills apartment

---

[6] The complaining witness testified that, after the initial e-mail communication, she received at least four more e-mails from someone self-identifying as Bradley Peterson.

complex and noticed a bicycle leaning against the stairs at the building's entrance. She added that the bicycle had "some belongings strapped to it," and she said that she "thought that was kind of odd." Ms. Zillich testified that she then reviewed camera footage; and on the footage she observed that a man, who was later identified as defendant, had been in the mailroom. According to Ms. Zillich, upon observing defendant on the camera footage, she went to the mailroom to question him because she knew he was not a tenant at the complex. Ms. Zillich stated that, when she asked defendant if she could help him, he replied: "I'm looking for my friend, [the complaining witness]," who he claimed was expecting him. Ms. Zillich recalled that she informed him: "You can give her a call. If not, you need to leave the building until she comes to get you. You can't be in the building." She testified that she then contacted the complaining witness to inform her what had happened, and she added that she sent her photographs from the camera footage.

Ms. Zillich further testified that she later received a phone call from her leasing associate, Malina Paniacca. On February 24, 2024, after speaking with Ms. Paniacca, Ms. Zillich checked the video surveillance and noticed that the same individual as had been involved in the February 21st encounter had returned to the Slater Cotton Mills apartment complex. She added that, when reviewing the February 24th video surveillance footage, she observed defendant holding what "seemed to be a magnet that said, 'I love you' * * *;" she stated that the video

- 8 -

surveillance footage shows that defendant "then slowly puts it down and walks casually away, like it was normal." Ms. Zillich testified that she gave this footage to the Bristol Police Department. She further stated that she also sent to the complaining witness a photograph "pulled from" the video surveillance footage.

On cross-examination, Ms. Zillich testified that, when she spoke to the individual on February 21, she felt "threatened by him." She added that she felt uncomfortable by the way he was standing and speaking to her.

## D

### The Testimony of Patrol Officer Raquel Pederzani

Officer Raquel Pederzani of the Pawtucket Police Department was the last witness called to testify. She testified that, on the morning of February 24, 2024, she heard about a call "regarding a suspicious person" near the Slater Cotton Mills apartment complex. She elaborated that "there was an unwanted party at the Slater Cotton Mills and that the property manager called it in." Officer Pederzani testified that the Pawtucket Police eventually located the individual who matched the description provided by Slater Cotton Mills.

Officer Pederzani testified that, upon arriving at the scene, she searched the area and interacted with the individual. She identified the individual as Bradley Peterson, who she noted is the defendant in this case. Officer Pederzani stated that, prior to February 24, she had had contact with defendant and knew who he was. It

was her further testimony that, when she spoke to defendant, he informed her that he was at the apartment complex to see the complaining witness. Officer Pederzani also stated that defendant voluntarily gave her his phone.

On cross-examination, Officer Pederzani testified that defendant was cooperative with the officers in the course of their investigation. She further acknowledged that he did not act in "any type of threatening manner towards" her and that he was peaceful throughout their interaction. Officer Pederzani testified that, once the investigation concluded, "he left without any incident." She additionally stated that there has been no indication that defendant ever returned to Slater Cotton Mills after that interaction.

**E**

**The Hearing Justice's Decision**

After the parties presented their arguments, the hearing justice rendered a bench decision, in which he found by a preponderance of the evidence that defendant had violated the terms and conditions of his probation. He summarized the evidence and testimony introduced at the hearing. In particular, he found that the complaining witness was terrified, that her "life changed tremendously," and that she "was concerned all the time, even though she did not know Mr. Peterson." The hearing justice explicitly stated that he found the testimony of the complaining witness's

mother, Ms. Zillich, and Officer Pederzani to be "highly credible." In addition, he found the complaining witness to be "very, very credible."

The hearing justice further stated that, although defendant did not testify, he observed him watch the complaining witness "carefully on the stand, though he did not do so with all of the witnesses." He added that, when Ms. Zillich and Officer Pederzani testified, defendant was "constantly looking at [the complaining witness]." The hearing justice also emphasized that, when the complaining witness testified as to how her life had been impacted, defendant seemed to have no reaction. He additionally made note of the fact that it "doesn't matter that [the complaining witness] * * * has a public presence." The hearing justice concluded that defendant's behavior was "unjustified" and that he had failed to keep the peace and be of good behavior. And he stated: "He is a violator * * * of his sentence."

## F

### The Sentencing

On July 10, 2024, the hearing justice heard the parties' arguments relative to what would be an appropriate sentence for defendant's probation violation. In applying the factors articulated by this Court in *State v. Tiernan*, 645 A.2d 482 (R.I. 1994), the state first provided a recitation of the facts of the underlying second-degree robbery conviction. The state added that it did not have any information relative to defendant's employment or educational background.

- 11 -

Regarding rehabilitation, the state posited that "defendant's long criminal history would make this defendant's possibility of rehabilitation extremely low." The state argued that defendant's history of violence (including the fact that the underlying conviction was for a violent crime) and "his inability to conform his actions to any type of norms or rules" are indications that rehabilitation is unlikely. Additionally, the state contended that the hearing justice should not overlook the triggering offense—namely, the stalking of the complaining witness. The state emphasized that defendant's actions "shattered [the complaining witness's] sense of privacy, shattered her sense of security." The state suggested that, in view of the court's findings concerning the instant probation violation, defendant should be sentenced to serve seven years of his suspended ten-year sentence.

Counsel for defendant pointed out that the charges which the state had referenced were approximately twenty years old and that the pending stalking charge did not assert that any type of violent action was taken by defendant. Counsel for defendant further contended that defendant's previous incarceration impacted his understanding of "certain social norms." Counsel stated that defendant was capable of rehabilitation and advocated for him to receive the "proper mental health treatment * * *."

In considering defendant's sentence, the hearing justice reviewed the factors enumerated by this Court in *State v. Tiernan*, 645 A.2d 482 (R.I. 1994), and *State v.*

*Gordon*, 539 A.2d 528 (R.I. 1988). The hearing justice acknowledged that the events that gave rise to the probation violation were nonviolent, but he also noted that defendant's actions placed the complaining witness in fear for her life when he is not incarcerated. He noted, among other things, that defendant had attempted to make contact with the complaining witness's mother and that he had been inside the complaining witness's apartment complex. The hearing justice additionally observed that defendant's behavior in the courtroom had been "somewhat odd" and that defendant is a "very troubled individual." He added that defendant's "history is clearly one of violence, and the impact upon [the complaining witness] is clearly significant." In addressing defendant's criminal history (specifically the second-degree robbery conviction), the hearing justice explicitly took note of that 1995 robbery conviction[7] and the "[o]bviously significant behavior."

Turning to rehabilitation, the hearing justice noted defendant's tendency to be impulsive. He stated that defendant's "potential for rehabilitation indicates that his attitude towards society is poor. He has no remorse." The hearing justice also determined that the punishment was "clearly appropriate here." Lastly, as it related to social deterrence, the hearing justice stated that "[s]ociety needs to know" that

---

[7]     *See Peterson*, 722 A.2d at 259-61.

- 13 -

individuals exhibiting "abhorrent" and unacceptable behavior such as defendant "are being dealt with by the courts in an appropriate manner."

For those reasons, the hearing justice sentenced defendant to serve nine years of his suspended ten-year sentence.

A judgment of conviction and commitment on the probation violation was entered on July 19, 2024. The defendant filed a notice of appeal on July 24, 2024.

## II

## Issue on Appeal

The defendant argues on appeal that the hearing justice imposed an excessive sentence and abused his direction when he considered "both the underlying conviction and the violation allegations * * * when he sentenced [defendant] to nine years to serve."

## III

## Standard of Review

When a trial justice is confronted with adjudicating an allegation of a probation violation, this Court has made it clear that "the sole issue for the court to consider at a probation-violation hearing is whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." *State v. Fairweather*, 138 A.3d 822, 826 (R.I. 2016) (internal quotation marks omitted). Pursuant to Rule 32(f) of the Superior Court Rules of

- 14 -

Criminal Procedure, the state must show "by a fair preponderance of the evidence that the defendant breached a condition of the defendant's probation * * * or failed to keep the peace or remain on good behavior." *State v. D'Amico*, 200 A.3d 1068, 1071-72 (R.I. 2019) (quoting Super. R. Crim. P. 32(f)).

In determining whether a defendant has violated his or her probation, the hearing justice weighs the evidence and assesses the credibility of the witnesses. *State v. Segrain*, 243 A.3d 1055, 1062 (R.I. 2021). We have additionally stated that "deference should be accorded to the assessment of the credibility of witnesses made by a judicial officer who has had the opportunity to listen to live testimony and to observe demeanor." *Fairweather*, 138 A.3d at 827 (internal quotation marks omitted).

**IV**

**Analysis**

On appeal, defendant contends that the hearing justice abused his discretion in considering both the underlying conviction and the alleged violation of his probation when he imposed what defendant considers to be an excessive sentence. In particular, defendant first argues that the hearing justice erroneously focused on defendant's recent conduct rather than primarily focusing on the original offense. Second, defendant also contends that "nine more years to serve for a second-degree robbery that occurred in 1993—when Mr. Peterson had already completed a

- 15 -

twenty-year sentence for that crime (in addition to five years as a habitual offender)—is excessive." The defendant notes that the "Superior Court Sentencing Benchmark for second-degree robbery, unarmed with no injury, is three to six years to serve." He argues that "[i]f the hearing justice's sentence is affirmed, [defendant] will face five to ten times the recommended sentence, not including the habitual sentence." Third, defendant posits that his recent conduct also does not warrant a nine-year sentence. Fourth, defendant takes issue with the hearing justice's reference to his criminal history. Finally, defendant asserts that he can be rehabilitated, emphasizing that he had been "working and staying out of trouble" since he was released from prison in 2017 until his arrest in 2024.

For its part, the state stresses that the hearing justice carefully addressed each *Tiernan* factor in his sentencing decision, including: the severity of the 1993 crime, defendant's personal background, his potential for rehabilitation, the appropriateness of the punishment, and the element of social deterrence. The state additionally argues that executing nine years of the ten-year suspended sentence is not excessive because defendant "is a habitual offender and, as this Court noted in *Peterson*, 722 A.2d[] at 261, had an active arrest warrant for domestic assault when he committed what this [C]ourt described as a 'carjacking.'" It is also the state's position that defendant minimizes the distressing and disturbing behavior that formed the basis of the instant probation violation. The state adds that, to the extent

- 16 -

that defendant is contending that his original sentence was excessive, the "time for challenging the 1995 second-degree robbery sentence has long since passed * * *."

This Court has "established that the unexecuted portion of a probationer's suspended sentence hangs over his or her head by the single horsehair of good behavior, until such time as the term of probation expires." *Segrain*, 243 A.3d at 1062 (internal quotation marks omitted); *see State v. Parson*, 844 A.2d 178, 180 (R.I. 2004); *see also State v. McKinnon-Conneally*, 101 A.3d 875, 879 (R.I. 2014). And "[w]hen a defendant severs that single horsehair by violating the terms and conditions of his or her probation, the hearing justice has wide discretion to determine whether to execute any or all of a defendant's previously suspended sentence." *Segrain*, 243 A.3d at 1062 (internal quotation marks and emphasis omitted). Importantly, this Court has firmly established that "although a hearing justice must focus primarily on the nature of the first offense, he or she may also consider the circumstances of the second offense." *Id.*; *see McKinnon-Conneally*, 101 A.3d at 879.

In our view, the hearing justice did not abuse his discretion by taking into account both the seriousness of the original felony as well as the very upsetting nature of defendant's recent conduct in sentencing him to the nine years remaining on his previously suspended ten-year sentence. This case is akin to that of *State v. Segrain*, 243 A.3d 1055 (R.I. 2021), in which this Court upheld the sentence imposed

by the hearing justice because she based "her sentencing decision on *several* factors, namely: the seriousness of the 2012 conviction; the gravity of the more recent conduct; the possibility of rehabilitation; and other traditional sentencing factors." *Segrain*, 243 A.3d at 1063 (emphasis in original).

In the case at bar, we are satisfied that the hearing justice conducted a thoughtful review of the relevant factors—namely, the severity of the original crime, defendant's personal and educational background, his potential for rehabilitation, the appropriateness of the punishment, and the element of social deterrence. *See State v. Tiernan*, 645 A.2d 482, 484 (R.I. 1994); *State v. Gordon*, 539 A.2d 528, 530 (R.I. 1988). He further carefully evaluated the evidence presented. In his decision, the hearing justice, while acknowledging that the event which gave rise to the probation violation was "nonviolent," emphasized the fearfulness that defendant's conduct caused the complaining witness to experience. And he also made note of the concerning "odd," "inappropriate," and "not socially acceptable" behavior exhibited by defendant. Notably, the hearing justice stated: "[The defendant's] history is clearly one of violence, and the impact upon [the complaining witness] is clearly significant."

In further addressing the facts precipitating the probation violation hearing, the hearing justice concluded that defendant's impulsive behavior was the "most frightening of all." He noted that defendant showed no remorse, and he determined

- 18 -

that defendant was not a good candidate for rehabilitation. *See Segrain*, 243 A.3d at 1062 ("We have found that consideration of the severity of a defendant's more recent wrongdoing as it relates to his or her ability to be rehabilitated is a factor that may be appropriately considered in making a sentencing determination.").

The hearing justice also gave weight to both the gravity of the "significant behavior" of the underlying second-degree robbery conviction and defendant's more recent violent behavior as evidenced in recent prison reports. In addition, he considered defendant's personal background, and he evaluated the factors of social deterrence and the appropriateness of the punishment. We are therefore persuaded that the hearing justice in the instant case considered several appropriate factors in making his sentencing decision and that he did not rely solely on defendant's more recent conduct.[8] *See State v. Christodal*, 946 A.2d 811, 818 (R.I. 2008) (holding in part that the hearing justice "did not act arbitrarily or capriciously in fashioning the defendant's sentence" because he conducted a "thoughtful analysis of the various relevant factors").

---

[8] Additionally, to the extent that defendant is challenging the original sentence imposed for the second-degree robbery conviction, it is our definite view that defendant is barred from asserting such a claim. We have made clear that "[a]ny objection to defendant's original sentence should have been made within 120 days of the time when the original sentence was imposed, pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure." *State v. Christodal*, 946 A.2d 811, 817 (R.I. 2008) (internal quotation marks and brackets omitted).

Accordingly, for the reasons discussed herein, the hearing justice did not abuse his discretion in executing the nine years of the defendant's original ten-year suspended sentence.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

Justice Goldberg did not participate.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Bradley Peterson. |
| **Case Number** | No. 2024-323-C.A. (N1/93-240A) |
| **Date Opinion Filed** | May 7, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Newport County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Jeffrey A. Lanphear |
| **Attorney(s) on Appeal** | For State: <br><br>Christopher R. Bush<br>Department of Attorney General<br>For Defendant: <br><br>Bradley Peterson, *pro se* |