**Supreme Court**

No. 2014-342-C.A.

(P1/10-203AG)

| | |
|---|---|
| State | : |
| v. | : |
| Jesus Danilo Fuentes. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                          :

v.                                             :

Jesus Danilo Fuentes.                          :


Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Jesus Danilo Fuentes, appeals from a judgment of conviction following a jury trial held in the Superior Court for Providence County. He was found guilty of Count One, the first-degree murder of Henry Vargas, in violation of G.L. 1956 § 11-23-1; he was also found guilty of Count Two, the discharge of a firearm while committing a crime of violence, "resulting in the death of Henry Vargas," in violation of G.L. 1956 § 11-47-3.2(b)(3).  The defendant's contention on appeal is that the trial justice erred when, in the defendant's words, "he refused to give an eyewitness identification jury instruction approved by this Court in State v. Werner, 851 A.2d 1093, 1102 (R.I. 2004)."  We disagree with the defendant's contention in this regard; and, for the reasons set forth below, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

In the early morning hours of November 6, 2009, Henry Vargas was shot outside Club Platinum, a nightclub on Broad Street in Providence; and, tragically, he died as a result.  His girlfriend, Carmelina Bueno, was an eyewitness to that shooting.

- 1 -

On January 15, 2010, a Providence County grand jury indicted defendant on two counts: Count One, the first-degree murder of Henry Vargas, in violation of § 11-23-1; and Count Two, the discharge of a firearm while committing a crime of violence, resulting in the death of Henry Vargas, in violation of § 11-47-3.2(b)(3). The defendant's jury trial, which was held in June of 2011, involved the testimony of twenty-two witnesses (seventeen testifying on behalf of the state and five testifying on behalf of the defense). At the conclusion of the trial, the jury returned a verdict finding defendant guilty of both of the above-referenced counts. On June 8, 2012, the trial justice sentenced defendant to two consecutive life sentences. A timely notice of appeal was filed.

We recount below the salient aspects of defendant's trial to the extent necessary to provide context for the single issue raised on appeal—whether or not the trial justice committed reversible error in denying defendant's motion for a jury instruction that would include, verbatim, particular language from the jury instructions in Werner, 851 A.2d at 1102 (i.e., the Werner instruction),[1] which language cautioned the jurors in that earlier case about the fallibility of eyewitness identification.[2]

---

[1] In this opinion, we shall usually refer to the instruction that is quoted in State v. Werner, 851 A.2d 1093, 1102 (R.I. 2004), which instruction defendant asserts should have been part of the jury instructions at his trial, as "the Werner instruction."

[2] In "Defendant's Motion for Jury Instruction," which was submitted to the Superior Court, he quoted the entirety of the Werner instruction and requested that the jury be instructed in those words.

**The Testimony of Carmelina Bueno**

Carmelina ("Carmen")[3] Bueno, the sole testifying eyewitness to the shooting of her boyfriend, Henry Vargas, testified that they had been "partner[s]" for five years. She stated that, on the night of November 5, 2009, she and Henry "went to a nightclub [in Providence] called Platinum," where they arrived at approximately 11:30 or 11:45 p.m. and from which they left at 1:00 a.m. She testified that, upon leaving Club Platinum, as she and Henry were crossing Aldrich Street (a street that intersects Broad Street, where Club Platinum is located)[4] to walk towards Henry's parked car, "there were two people behind [them]"—one woman and one man; she added that she looked at the man for a "[f]ew seconds." In addition, she stated that she saw another female, who she said was "cross[ing] the street." Her testimony was that, once she and Henry reached his car, she walked to the passenger side, while he went to the driver's side. Carmen testified on direct examination that the above-referenced man, who was behind them as they crossed Aldrich Street, "called Henry out to fight and said[:] 'You fat one, didn't you want to fight me? Come now.'" When she was further asked on direct whether or not she "notice[d] anything about the man as he said those words[,]" she replied: "I kept looking at him to see if it was true that he wanted to fight, but, when I saw him smiling, then I turned my face towards Henry. And Henry was already running towards him." It was Carmen's testimony that she "walked towards the back" of Henry's car because Henry was no longer in her sight. Then, she and the prosecutor engaged in the following exchange about the shooting incident:

---

[3]     Because Henry Vargas and Carmelina ("Carmen") Bueno are so frequently referred to only by their first names throughout the record, we shall do likewise. In doing so, we intend no disrespect.

[4]     When Carmen was asked about the lighting conditions at the corner of Aldrich and Broad Streets at approximately 1:00 a.m., she said: "You could see clearly." She noted that there were street lights outside—although she did add that "[i]t was drizzling."

"[PROSECUTOR]:  What's the next thing you remember?
"[CARMEN]:   The man grabbed the gun.  (Witness crying) * * *.
And he started shooting at [Henry].  (Pause)  I called Henry, and I
told him to come back.
"[PROSECUTOR]:  Carmen, you said the man pulled out a gun?
"[CARMEN]:  He took the gun out of the jacket.
"[PROSECUTOR]: Did you see him fire a shot?
"[CARMEN]:  Yes.  I saw him.  I can't forget that.
"* * *
"[PROSECUTOR]:  * * * [W]hat happened next?
"[CARMEN]:  He kept shooting.  Henry came to me.
"[PROSECUTOR]:   From the time that you heard the man say
'Hey fat boy,' until the time that he was done shooting, how long
did you look at the man?
"[CARMEN]:  The whole time he was shooting.
"[PROSECUTOR]:  Do you know how -- can you estimate how
long that was?
"[CARMEN]:  To me, it was an eternity, but I don't know."

Carmen further testified that, while the shooting was taking place, she "didn't do anything" and "stood there," looking at the shooter, who faced in her direction; she added that she focused on the shooter's face, particularly "his smile."  When Carmen was asked whether "anything that distracted [her] view of the [shooter,]" she answered in the negative.  She also testified to having simultaneously heard one of the two previously mentioned women who were close to the scene of the shooting say: Danilo, "what are you doing?"[5]  Carmen stated that she saw the shooter run, and she said that he "kept on shooting;"[6] she added that, in reaction to the shots being fired, the two above-referenced women, both of whom were standing near the shooter, started running.  Carmen stated that she told Henry to "throw [him]self on the ground."

---

[5]     The trial transcript records Carmen's testimony as to her recollection of the name uttered by one of the women at the time of the shooting as being variously "Dareeo (phonetic)" and "Dario (phonetic)."  However, at another point, the transcript records Carmen's recollection of what the woman said as: "Danilo, what are you doing?"  (It will be recalled that defendant's middle name is Danilo.)

[6]     When Carmen was asked on cross-examination at trial whether she had previously testified before the grand jury that the shooter had been standing still, she responded in the affirmative.

- 4 -

On cross-examination, Carmen testified that, after the shooting, Henry told her that he had been hit; and she said that she "walked to him to see what had happened." It was further Carmen's testimony that she saw the shooter, who had been running, get into the passenger side of a dark-colored SUV parked on Aldrich Street, which vehicle then departed. She stated that, after calling 911, she saw Henry lying on the ground and she felt afraid that "[he] was going to die." Carmen conceded on cross-examination that her attention was on Henry at that moment. She further testified that two of the three security guards from Club Platinum[7] approached her and one of them asked what had happened. She stated that she told that inquiring security guard that "he knew who had done it;" she added, however, that he replied that he did not know.

Upon being questioned at trial as to the description of the shooter, Carmen replied: "He didn't look too tall." She added that the shooter was "maybe five-nine, [or] five-ten." Carmen testified that "[h]e was 36 or 37 years old" and weighed about 170 pounds. She further described the shooter as having had "short black hair" and "a clean face" and no facial hair. Carmen added that she had seen the shooter wearing "jeans and a [black] jacket."[8] It was also her testimony on cross-examination that she had previously told the police that the shooter "looked and sounded Dominican;" however, in her testimony before the grand jury, she had said that the shooter had "light skin, like an Indian." At trial, Carmen explained as follows the just-quoted description of

---

[7]     According to Carmen, she had seen three security guards working at Club Platinum on the night in question. Each of them was male; the first she described as being "[c]hubby" and "bald;" the second she described as being "[d]ark-skinned;" and the third security guard she said was "[t]he one who killed Henry." (After a careful perusal of the record, we note that there was no evidence indicating that defendant worked as a security guard at Club Platinum.)

[8]     We also note that, later in Carmen's testimony at trial, she responded in the affirmative to having earlier seen the shooter inside Club Platinum (on the night of November 5) wearing a "black [shirt]" with "white letters that spelled [the word] 'security'" on the back of his shirt.

the shooter: "For us, an Indian is a person [who is] not dark nor white." When Carmen was asked if she were referring to a Native American, she replied: "No. An Hispanic."

On direct examination, Carmen stated that, at 4:30 a.m. in the morning of the November 6 shooting, she gave a statement to Detective Kenny Court of the Providence Police Department. Carmen further testified that she met with Det. Court on three occasions—viz., November 6, 7, and 10. She said that, on one of those occasions, the detective showed her a photograph of DJ Nelson, a disc jockey who had been at Club Platinum on the night in question; she stated that she responded to the detective that DJ Nelson and the person who killed Henry "look[] alike, but DJ Nelson is darker." Although Carmen admitted that she could not "determine the [skin] color" on the basis of the black-and-white photograph shown to her by the detective, she nonetheless said that she could comment on "the face." On cross-examination, defense counsel posed questions to her as to whether or not she had told the police that DJ Nelson shot Henry or that she was "80 percent sure that DJ Nelson shot Henry," but Carmen repeatedly replied: "No." (It bears noting that Carmen later acknowledged in her testimony at trial that she once told an investigator named Ralph Gemma and his paralegal that she "believed [DJ Nelson] was involved in the shooting.")

Carmen further testified that, on the night of November 15, 2009 (over a week after the shooting of Henry), she was at the home of her sister, Jacinta, in a housing complex referred to in the record as "Chad Brown." Carmen stated that Jacinta "saw [DJ Nelson] coming out of a SUV with men," which Carmen acknowledged took place outside the Chad Brown complex. She said that, in reaction thereto, the two sisters became "nervous;" she added that, in due course, Jacinta called the police. On direct examination, Carmen acknowledged that she was "afraid" of DJ Nelson due to the fact that, on a prior occasion at Club Platinum, Henry had "said [to her] that somebody had [told him] that they wanted to kill him * * *." Carmen continued summarizing

what transpired on that prior occasion as follows: "And then I said[,] 'Who is it? Show me.' And * * * Henry said, 'No. DJ Nelson took him away.'" She added that her fear on November 15 also stemmed from the fact that the shooter had not yet been apprehended and the fact that she "didn't know who DJ Nelson was with." Notably, however, later in her testimony at trial, Carmen stated that she was no longer afraid of DJ Nelson.

It was further Carmen's testimony that, on December 1, 2009, she met with Detective Emilio Matos, who presented her with a photo array and told her "[t]o take [her] time" looking at the photographs. However, she testified that, in "[l]ess than a minute," she identified defendant as the person involved in the shooting of Henry, circling photograph "[N]umber 3" from the photo array. Carmen explained her selection of defendant (who appeared in photo number 3) as follows: "I selected picture number 3 * * * [b]ecause of his face, and I chose him because he said come fight. Grabbed the gun and shot [Henry]." Upon being asked whether or not she saw the shooter in the courtroom at trial, Carmen responded in the affirmative; and the record reflects that, at that juncture, Carmen proceeded to identify defendant as the individual who shot Henry. On cross-examination, defense counsel inquired of Carmen as to whether or not Det. Matos had told her: "Now that you've picked this person out, don't change it this time." Her answer to that question was: "I don't remember that. He never said that."

Carmen also testified that, earlier in the evening of the shooting, during the time when "[t]he lights were already on," she had seen the shooter (whom she sometimes referred to in her testimony as the third security guard)[9] near Henry inside Club Platinum. And she further testified that she saw the third security guard "arguing with Henry" at Club Platinum; she added that, thereafter, she heard one of those two men say: "[I]f he touched him once more, he would

---

[9]    See footnote 7, supra.

have a problem." Carmen acknowledged that someone named Frank intervened and told them to stop arguing. On cross-examination, defense counsel asked Carmen if she had ever said to Det. Court or Det. Matos that she was no longer sure whether the security guard who had argued with Henry inside Club Platinum was the same man who had shot Henry, and she replied: "What I said is that I wasn't sure if he was wearing a jacket or a T-shirt, but I never said that it wasn't the same person." Carmen added, "It [was] the same person that argued with Henry."

In due course, the trial justice expressly noted that he had received defendant's request for a "proposed instruction" on "eyewitness identification, citing and reflecting language contained in the Werner case."[10] The trial justice declined to grant defendant's jury instruction request.

## II

## Standard of Review

This Court reviews a trial justice's jury instructions de novo. See State v. Imbruglia, 913 A.2d 1022, 1031 (R.I. 2007); see also State v. Ros, 973 A.2d 1148, 1166 (R.I. 2009). In conducting such a review, we must scrutinize "the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them," and we must review the challenged portions of the instructions "in the context in which they were rendered" by the trial justice. State v. Cardona, 969 A.2d 667, 674 (R.I. 2009) (internal quotation marks omitted); see Imbruglia, 913 A.2d at 1031; see also State v. Gomes, 604 A.2d 1249, 1256 (R.I. 1992); State v. Lamoureux, 573 A.2d 1176, 1179 (R.I. 1990).

As we have indicated on numerous occasions, "[i]t is a fundamental principle that a trial justice must instruct the jury on the law to be applied to the issues raised by the parties." State v.

---

[10] We remind the reader that the eyewitness identification language that defendant wanted the trial justice to use is quoted and set forth in Werner, 851 A.2d at 1102.

- 8 -

Figuereo, 31 A.3d 1283, 1290 (R.I. 2011) (internal quotation marks omitted); see State v. Lynch, 770 A.2d 840, 846 (R.I. 2001). A principle that is also pertinent in the instant case is that, "[w]hile a defendant may request that the trial justice include particular language in the jury instructions, the trial justice is not required to use any specific words or phrases when instructing the jury—so long as the instructions actually given adequately cover the law * * *." State v. Adefusika, 989 A.2d 467, 477 (R.I. 2010) (internal quotation marks omitted); see also State v. Gillespie, 960 A.2d 969, 975 (R.I. 2008). And it goes without saying that "the law" which the instructions must adequately cover is the law as it exists at the time of trial.

Finally, even if a challenged jury instruction is deemed to have been erroneous, reversal is warranted "only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." State v. Sivo, 925 A.2d 901, 913 (R.I. 2007) (internal quotation marks omitted).

## III

### Analysis

On appeal to this Court, defendant contends that "the trial justice erred when he refused to give an eyewitness identification jury instruction approved by this Court in State v. Werner, 851 A.2d 1093, 1102 (R.I. 2004)," which instruction is quoted verbatim in that opinion.[11] In his

---

[11] From a reading of State v. Werner, 851 A.2d 1093 (R.I. 2004), it is clear that we never used the word "approved" therein with respect to the jury instruction presently at issue. While recognizing that in State v. Davis, 131 A.3d 679, 694-95 (R.I. 2016), we did use that verb with respect to the Werner instruction, we in no sense indicated that we were adopting it as a model or mandatory instruction on eyewitness identification. Indeed, in Davis, 131 A.3d at 695, we specifically noted that the Werner instruction "straddled the fine line between directing the jury's attention to the inherent problems of eyewitness testimony and improperly commenting on issues within the framework of lay opinion." (Internal quotation marks omitted.)

It should also be borne in mind that the principal issue in Werner, 851 A.2d at 1099-1103, was whether or not the trial justice had abused his discretion in denying the defendant's motion to present expert testimony regarding eyewitness identification, which is certainly not an

appellate papers, defendant focuses on the following alleged errors by the trial justice: "(1) under Rhode Island jurisprudence, it was error not to give the jury instruction requested * * * [;] (2) Carmen Bueno's identification of Mr. Fuentes was especially unreliable[;] (3) [a] jury would not be able to properly weigh the credibility of Ms. Bueno's identification in the absence of the instruction requested * * * [;] and, (4) [the trial justice's] failure to provide the State v. Werner jury instruction gravely prejudiced the defense."

For its part, the state, citing several opinions of this Court, responds that the trial justice's decision "complied with Rhode Island law at the time [defendant's] case was tried." Specifically, the state asserts that, until the issuance of our opinion in State v. Davis, 131 A.3d 679, 697 (R.I. 2016) ("[T]he better practice would be for courts to provide the jury with more comprehensive instructions when eyewitness testimony is an issue * * *."),[12] "it [w]as established Rhode Island law that a specific jury instruction on [eyewitness] identification [was] not mandatory and [that a trial justice's] failure to give such an instruction [was] not reversible error." As a corollary to that assertion, the state argues that "Davis should not be applied retroactively to * * * case[s] tried before" the issuance of that opinion. Accordingly, the state contends that the trial justice who presided over defendant's trial in 2011 "did not abuse his

---

issue raised on appeal today. And our narrow holding in that case was "that the trial justice did not abuse his discretion in finding that, based on the facts of th[at] case, an expert was not needed to testify on the issues defendant raised." Werner, 851 A.2d at 1101.

[12] Although we agree with the state that the aspirational dictum that we made in Davis has no relevance to the case at bar, we take this opportune moment to indicate that it represented our awareness of the evolving nature of our thinking on the issue of eyewitness identification testimony. See Davis, 131 A.3d at 696 n.13 (recognizing that we continue to be "cognizant of the growing concern in other jurisdictions with reliance on eyewitness identification testimony, the growing body of scientific and psychological studies regarding the questionable accuracy of the accounts of eyewitnesses, and the efforts made to prevent a miscarriage of justice"). While this Court in Davis did not announce a new rule of law as such, that opinion's reference to "the growing concern in other jurisdictions" should not be overlooked.

discretion in refusing to provide the jury with [an] * * * instruction concerning the weaknesses of eyewitness identification."

After thoroughly perusing the record and after reviewing pertinent case law, we are unable to discern any error on the part of the trial justice in refusing to grant defendant's request to give the Werner instruction. Moreover, an examination of the instructions given in the present case reveals that the trial justice provided the jurors with proper guidance as to the principles with which they would need to grapple in the course of their deliberations. The trial justice issued prefatory instructions about the presumption of innocence and about the state's obligation to prove beyond a reasonable doubt: the existence of "each and every element of any offense charged" and that "defendant * * * did in fact commit" each offense charged. The trial justice summarized the specific charges against defendant and then, with admirable perspicacity, instructed the jury to consider factors relative to witness credibility—including, but not limited to, the "age," "intelligence," "candor," "prejudice," "motive," "appearance," "conduct," and "demeanor" of each testifying witness. Noting that "there isn't any magical formula by which [a juror] can weigh and assess the credibility of witnesses," the trial justice advised the jurors that they should "bring * * * all of [their] experience from [their] everyday lives." In addition, and notably, he instructed the jurors that they might consider "corroborating or contradictory evidence, as well as any consistencies or inconsistencies between what a witness testified to at trial and what that witness may have said * * * earlier[.]"

It is our opinion that the instructions given to the jury by the trial justice comported with our case law. See State v. Payette, 557 A.2d 71, 73 (R.I. 1989) ("[I]t is established Rhode Island law that a specific jury instruction on identification is not mandatory and failure to give such an instruction is not reversible error."). Of particular significance in view of defendant's appellate

- 11 -

contentions, we note that the trial justice conscientiously exercised his discretion with respect to the issue of eyewitness identification—and he more than adequately covered the pertinent law in his instructions. See Adefusika, 989 A.2d at 477; see also Gillespie, 960 A.2d at 975. Specifically, he conveyed to the jurors that the state must "prove beyond a reasonable doubt" that "defendant at trial did in fact commit" "each and every element of any offense charged." See Imbruglia, 913 A.2d at 1033. In view of the somewhat undulating nature of Carmen's eyewitness testimony, we consider to have been of particular potential helpfulness to the jurors the following counsel contained in the seasoned trial justice's instructions:

> "The jury system works because you, individually and collectively, bring to the courthouse all of your experiences from your everyday lives. Every day, in a variety of contexts, you decide for yourselves the reliability or the unreliability of statements made to you by others. I suggest to you that those are the best tests to apply when you evaluate the weight and assess the credibility of the witnesses."

At the end of the day, it is clear to us that the trial justice did not err in denying the defendant's request for a jury instruction on eyewitness identification, which instruction the defendant wanted to be taken verbatim from Werner, 851 A.2d at 1102.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record may be returned to that tribunal.

Justice Indeglia did not participate.

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Jesus Danilo Fuentes. |
| **Case Number** | No. 2014-342-C.A.<br>(P1/10-203AG) |
| **Date Opinion Filed** | June 21, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Department of Attorney General<br><br>For Defendant:<br><br>Lara E. Montecalvo<br>Office of the Public Defender |