June 28, 2021

**Supreme Court**

No. 2019-100-C.A.
(P1/17-1770AG)

State                    :

v.                     :

Gregory Hampton-Boyd.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | |
|---|---|
| State | : |
| v. | : |
| Gregory Hampton-Boyd. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.** This case came before the Supreme Court on May 5, 2021, on appeal by the defendant, Gregory Hampton-Boyd, from a judgment of conviction entered in the Superior Court following a jury verdict of guilty on one count of first-degree robbery, in violation of G.L. 1956 § 11-39-1(a); one count of discharging a firearm while committing a crime of violence, in violation of G.L. 1956 § 11-47-3.2(b); one count of possession of a firearm without a license, in violation of § 11-47-8(a); one count of possession of a firearm after being convicted of a crime of violence, in violation of § 11-47-5; and one count of assault with a dangerous weapon, in violation of G.L. 1956 § 11-5-2.

On appeal, the defendant argues that the trial court erred in refusing to instruct the jury on cross-racial identification and that the trial court's denial of his motion

to dismiss the state's habitual offender notice violated his right to due process. For the reasons set forth in this opinion, we affirm the judgment of conviction.

**Facts and Travel**

The incident from which the charges arose took place in the early morning hours of April 8, 2017, after defendant and his friends Jason Aparicio and Jay[1] drove from Boston to Providence the prior evening and decided to visit the Masheratti Lounge, a hookah lounge and nightclub located at 334 Elmwood Avenue.[2] Aparicio testified that, before they went inside, Jay stashed drugs and a black and silver gun in the car. Aparicio also stated that defendant was carrying a small black firearm in his pocket when they entered the club.

Video surveillance from inside and outside the club showed defendant and Aparicio leaving the club at approximately 1:02 a.m. The same video showed the victim, Rafael Fernandez, leaving the club at approximately 1:05 a.m. Fernandez testified that he left alone and began walking to his vehicle, where a black man blocked him from opening the door and demanded his gold chain, taking out a small black gun and threatening to shoot him. When Fernandez refused to give up his chain, a struggle ensued: Fernandez hit his attacker in the face with a Johnny Walker

---

[1] The defendant's friend, Jay, was referred to solely by his first name during the proceedings in the trial court. Of necessity, we continue that usage in our opinion, meaning no disrespect.

[2] The club in question was referred to throughout the proceedings as both Club Masheratti and the Masheratti Lounge.

bottle, which broke, and his attacker shot him three times before fleeing with his gold chain. Fernandez began to pursue the assailant, but after he heard gunshots behind him from another shooter in the parking lot across the street, he instead ran back into the club. Although he did not see the second shooter, Fernandez "believe[d] it was one of [the assailant's] friends."

A police officer on patrol in the immediate area, Lieutenant Joseph Dufault, heard the gunshots and called dispatch, broadcasting "shots fired[.]" He then followed a dark four-door sedan that fled the scene, ultimately losing the vehicle and calling in its last location. Patrolman Brian Muldoon, heading toward Lt. Dufault's location, saw a vehicle matching the lieutenant's description of a "small gray sedan" driving at a high speed with its lights off and pursued it, eventually heading down Union Avenue. As the car turned right onto Webster Avenue, Officer Muldoon saw a passenger jump from the moving vehicle. The officer later testified at trial that he observed that passenger, a black male in black clothing, drop a gold chain and a black and silver firearm, losing his right shoe as he rolled out of the vehicle.

While Officer Muldoon continued to pursue the vehicle, his partner Patrolman Peter Colt (who was following close behind Officer Muldoon's vehicle) stopped to pursue the suspect on foot but, upon seeing the firearm, necklace, and shoe, waited until detectives from the Bureau of Criminal Identification arrived to document the scene and seize the evidence. Officer Colt directed another police officer who

arrived on the scene, Patrolman Erick Fernandez, down Elmdale Avenue in pursuit of the suspect, whom Officer Colt described as a "Hispanic male, darker skinned, dark clothing." Officer Fernandez apprehended defendant and arrested him. The defendant had been shot in the shoulder and was missing a shoe. The police were later directed to where the vehicle had been abandoned in a parking lot, the engine still running. Through the window they observed and recovered a small black firearm, partially covered by a black jacket on the passenger seat.

At Rhode Island Hospital, the victim Fernandez described those involved in the robbery only as a black man and a Puerto Rican man when he spoke with Detective Matthew Cute at around 2 a.m. on April 8. Around midafternoon that same day, Fernandez described his attacker as a black male, around 5 feet 10 inches tall, with a thin build, clean cut with a beard, and wearing a long gold chain with a Jesus head medallion.[3] He also told police officers that he had been shot at by a second individual. On April 11, Fernandez was released from the hospital. After he returned home, an employee of the club sent Fernandez video from inside the club on the night of the assault, which showed defendant. On April 13, Fernandez went to the police station and was presented with two separate six-photograph arrays by

---

[3] At trial, Fernandez repeated this testimony, describing his assailant as "a black person with a beard and thin[,]" who was dressed "completely in dark clothes" including "a hoodie" and wearing "a necklace" with "the face of Christ on it."

- 4 -

a blind administrator. Fernandez identified defendant as the person who shot and robbed him, signing defendant's photograph in the photo array.[4]

Also on April 13, victim Fernandez gave a formal statement to the police, with the assistance of a translator, during which he was directed to write on the photograph of defendant how he recognized him and why he had signed that particular photograph. Fernandez wrote, in Spanish: "This is the person that shot at me on the night of 4/8/17 to rob me of a gold chain," stating that he was 100 percent sure. While giving his statement, Fernandez told the police that he had "obtained some photographs * * * from the club on that night" prior to coming in. He also stated that he was "not a hundred percent sure, but he thought that [his attacker] maybe had like a gold chain[,]" recalling the Jesus head medallion, which he remembered seeing on defendant inside the Masheratti Lounge, when prompted by the police about his prior statements.

On June 29, 2017, defendant was charged by indictment with first-degree robbery, conspiracy to commit robbery, discharging a firearm while committing a crime of violence, two counts of carrying a pistol without a license, possession of a

---

[4] Fernandez also identified Aparicio as the person across the street who shot at him as he ran back to the nightclub. Aparicio, who separately pled guilty to assault upon Fernandez with a deadly weapon, carrying a firearm without a license, and possession of a firearm after a previous conviction of a crime of violence, also testified at defendant's trial that, on hearing the initial gunshots fired that night, he took a black and silver handgun Jay had stored in the car and shot into the crowd, firing five or six times.

- 5 -

firearm despite his prior conviction of a crime of violence, knowing possession of a stolen firearm, assault with a dangerous weapon, and being armed with a stolen firearm during the assault. On September 7, 2017, the state served notice on defendant that he would be subject to an additional sentence upon conviction as a habitual offender, based upon four prior convictions in Massachusetts.

Trial commenced approximately seven months later, at which point the state dismissed three of the charges against defendant, relating to conspiracy, knowing possession of a stolen firearm, and being armed with a stolen firearm during the assault. The defendant filed a motion to dismiss or preclude the state from pursuing its habitual offender notice against him, which the trial justice held was not ripe for determination until the jury rendered its verdict.

The trial lasted for seven days. When Fernandez testified, he made an in-court identification of defendant as the person who had shot and robbed him. The defendant did not challenge the in-court identification by Fernandez, nor did he challenge the out-of-court identification procedure. At the close of the case, defendant submitted a written request for a jury instruction on cross-racial eyewitness identification, as well as two binders of authorities and research in support of his request, arguing to the trial justice for its inclusion. The trial justice rejected the requested instruction, finding his own instruction regarding eyewitness identification sufficient. The instruction given to the jury read:

"Let me speak to you about eyewitness identification. Assessing the reliability of an eyewitness requires that you consider the totality of the circumstances surrounding the identification of the defendant.

"Some of the factors which you should consider include the opportunity that the witness had to observe the person, such as the distance between the witness and the person, the duration of the event, the lighting conditions, and any impairment that may have affected the witness's perception.

"*You may consider* the witness's state of mind, his degree of attention or distraction or stress during the encounter, the presence of a firearm, *any ethnic or racial differences between the witness and the assailant*, together with any evidence in the case which you believe may bear on the reliability of the witness's identification of the defendant.

"If there was a subsequent identification of the defendant by the witness, such as a photo line-up, you may consider the procedures utilized, as well as the length of time between the crime and the subsequent identification, along with the level of certainty expressed or demonstrated by the witness when he identified the defendant. Certainty may not always constitute accuracy." (Emphasis added.)

The jury returned its verdict, finding defendant guilty of first-degree robbery, assault with a dangerous weapon, discharge of a firearm during a crime of violence resulting in injury, and one charge of carrying a pistol without a license (as to the .380-caliber Ruger). Immediately afterwards, pursuant to a stipulation made prior to trial, the trial justice announced that defendant was also guilty of the unlawful possession of a firearm, having previously been convicted of a crime of violence. Subsequently, the trial justice heard and denied defendant's motion for a new trial.

Thereafter, the trial justice sentenced defendant to twenty-five years to serve on count one, the robbery charge; a consecutive twenty-year term, with ten years to serve without parole and the balance suspended, with probation and without parole, on count three, discharging a firearm during the course of a crime of violence causing injury; two five-year sentences to serve concurrent with count one, on counts five and six, carrying without a license and felony possession of a firearm; and a consecutive fifteen-year term, with two years to serve without parole and thirteen years suspended, with probation and without parole, due to his status as a habitual offender.[5] The defendant timely appealed.

**Standard of Review**

"This Court reviews a trial justice's jury instructions *de novo.*" *State v. Fuentes*, 162 A.3d 638, 644 (R.I. 2017). "In conducting such a review, we must scrutinize 'the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them,' and we must review the challenged portions of the instructions 'in the context in which they were rendered' by the trial justice." *Id.* (quoting *State v. Cardona*, 969 A.2d 667, 674 (R.I. 2009)). "It is the duty of the trial justice to 'instruct the jury on the law to be applied to the issues raised by the parties.'" *State v. Austin*, 114 A.3d 87, 97 (R.I. 2015)

---

[5] The defendant was not sentenced on count ten, assault with a dangerous weapon, because the parties agreed that it had merged into the count one robbery charge.

(quoting *State v. Figuereo*, 31 A.3d 1283, 1290 (R.I. 2011)). "While a defendant may request that the trial justice include particular language in the jury instructions, the trial justice is not required to use any specific words or phrases when instructing the jury—so long as the instructions actually given 'adequately cover the law * * *.'" *State v. Adefusika*, 989 A.2d 467, 477 (R.I. 2010) (quoting *State v. Palmer*, 962 A.2d 758, 764, 769 (R.I. 2009)). Consequently, "[a] trial justice's refusal to grant a request for jury instruction is not reversible error if the requested charge is fairly covered in the general charge." *State v. Hallenbeck*, 878 A.2d 992, 1008 (R.I. 2005) (quoting *State v. Lynch*, 854 A.2d 1022, 1044 (R.I. 2004)). We have previously stated that "it goes without saying that 'the law' which the instructions must adequately cover is the law as it exists at the time of trial." *Fuentes*, 162 A.3d at 644.

"Under the principle of *stare decisis*, this Court always makes a concerted effort to adhere to existing legal precedent." *Pastore v. Samson*, 900 A.2d 1067, 1077 (R.I. 2006). This is because, among other reasons, "[t]he respect given the Court by the public and by the other branches of government rests in large part on the knowledge that the Court is not composed of unelected judges free to write their policy views into law." *Id.* (quoting *State v. Musumeci*, 717 A.2d 56, 68-69 (R.I. 1998) (Weisberger, J., concurring in part and dissenting in part); *see* Lewis F. Powell, Jr., *Stare Decisis and Judicial Restraint*, 1991 Journal of Supreme Court History 13, 16.

**Discussion**

**Jury Instruction**

Before this Court, defendant first argues that the trial justice erred in failing to give defendant's requested instruction regarding cross-racial identifications.[6]

Many courts, including ours, have struggled with the proper procedural home for scientific data on the reliability of eyewitness identification. *See United States v. Jones*, 689 F.3d 12, 20 (1st Cir. 2012); *State v. Werner*, 851 A.2d 1093, 1103 (R.I. 2004) (*Werner II*) (affirming the decision of a trial justice to disallow expert testimony regarding the fallibility of eyewitness identification and approving the jury instructions given, because those "instructions had much of the same effect on the jury as listening to an expert"); *State v. Martinez*, 774 A.2d 15, 19 (R.I. 2001) (affirming a prior holding "that testimony concerning the reliability or unreliability of an eyewitness would serve only to confuse and mislead the jury, rather than aid them in their mission as fact finders").

Unlike the caselaw from certain other jurisdictions cited to by defendant, this Court has never held that a trial justice is required to instruct the jury on cross-racial identification. *Compare Commonwealth v. Gomes*, 22 N.E.3d 897, 900 (Mass. 2015)

---

[6] The defendant's proposed instruction would have advised the jury that, "[i]f the witness and the person identified appear to be of different races, you should consider that people may have greater difficulty in accurately identifying someone of a different race than someone of their own race."

- 10 -

(concluding that "there are scientific principles regarding eyewitness identification that are 'so generally accepted' that it is appropriate in the future to instruct juries regarding these principles"), *and Commonwealth v. Bastaldo*, 32 N.E.3d 873, 877 (Mass. 2015) (holding that, prospectively, "a cross-racial instruction should always be included when giving the model eyewitness identification instruction, unless the parties agree that there was no cross-racial identification"), *with State v. Payette*, 557 A.2d 72, 73 (R.I. 1989) ("[I]t is established Rhode Island law that a specific jury instruction on identification is not mandatory and failure to give such an instruction is not reversible error.").

Indeed, the closest this Court has come to recommending the inclusion of such instructions is in *State v. Davis*, 131 A.3d 679 (R.I. 2016), where we noted that "the better practice would be for courts to provide the jury with more comprehensive instructions when eyewitness testimony is an issue[.]" *Davis*, 131 A.3d at 697. Later, in *Fuentes*, cited *supra*, we clarified that this was an "aspirational dictum" that "did not announce a new rule of law as such," while maintaining that our reference in *Davis* "to 'the growing concern in other jurisdictions' should not be overlooked." *Fuentes*, 162 A.3d at 645 n.12.

Our established caselaw at the time of defendant's trial is clear:

> "Because this Court repeatedly has confirmed that an instruction on the reliability of an eyewitness identification is not mandatory, but, at the same time, has held that it is not error to decline to give such an

- 11 -

instruction, it is certainly fair to say that we have not adopted a hard-and-fast rule and that trial justices retain significant discretion with respect to the issue of eyewitness identification." *Davis*, 131 A.3d at 696.

In ruling on the requested instruction, the trial justice noted that defendant had made no motion to suppress any purportedly cross-racial identifications that would justify the inclusion of his requested instruction, but he nevertheless reviewed and considered the material provided on the issue.

After hearing the defense's argument for their preferred language, the trial justice stated that,

> "while the articles and studies that have been proffered by the defendant in the instant case in support of the *Gomes* instruction are of interest, and I have read through them—it's not the first time I've seen them because the matter has come up in other cases before this one * * * there is other material, including case law, which does not endorse the use of an instruction which is as assertive or as insistent as the one which the defendant requests in this case."

Only vigorous argument from both sides regarding an allegedly objectionable identification, as provided during a hearing on a motion to suppress, would allow the court to adequately consider the factual circumstances unique to that identification. Without such fact-based arguments to support the inclusion of defendant's requested language, the trial justice properly relied on the law.

Here, the trial justice gave a lengthy rationale explaining his understanding of the caselaw that constrained his discretion. The trial justice correctly noted that,

- 12 -

traditionally, this Court has held that a trial justice should not intrude on the province of either the jury or the advocates. *See State v. Werner*, 831 A.2d 183, 205 (R.I. 2003) (*Werner I*) (agreeing "that the [trial] justice 'must not infringe upon the factfinding province of the jury by coercion or improper suggestion'") (quoting *State v. Souza*, 425 A.2d 893, 900 (R.I. 1981)); *State v. Hadrick*, 523 A.2d 441, 444 (R.I. 1987) (finding no error where a trial justice refused to instruct the jury on cross-racial identification, which "might be construed as commentary on the quality or credibility of particular evidence"); *State v. Fenner*, 503 A.2d 518, 525 (R.I. 1986) ("It is not the function of a trial justice to act as advocate for either the prosecution or the defense."). Additionally, the trial justice here directly addressed our holdings in *Davis* and *Fuentes*, finding that his instruction met the standards articulated in those cases.

This Court is aware that the science surrounding cross-racial identification and its reliability, like the science on the reliability of eyewitness identification generally, has evolved considerably over the past forty years. *See Perry v. New Hampshire*, 565 U.S. 228, 262 (2012) (Sotomayor, J., dissenting) (describing this change and noting that "eyewitness misidentification" is a great danger and cause of wrongful convictions); *Bastaldo*, 32 N.E.3d at 880-81 (referencing the "near consensus in the relevant scientific community" on "[t]he existence of the

- 13 -

'cross-race effect' (CRE)—that people are generally less accurate at identifying members of other races than they are at identifying members of their own race").

Importantly, we are not confronted here with a case in which the only evidence against defendant was a questionable cross-racial identification. Substantial evidence pointed to defendant's guilt, including the testimony of multiple police officers who apprehended defendant wearing only one shoe—a black Space Jam 11 Air Jordan sneaker—and also recovered a matching shoe alongside a .40-caliber weapon and the stolen necklace.[7] As discussed *supra*, this is also not a case in which the defendant raised the issue of a cross-racial identification at trial in a meaningful way or even challenged the reliability of the victim's identification. Consequently, we do not have before us any findings regarding the relevancy of the binders of scientific studies offered to the trial justice, nor was there counter-information supplied by the state. Without such findings, this Court will not inject that information into our review of this case.

However, the language that the trial justice included regarding the consideration of race in this case does give us pause. Here, the jury was told that they could consider differences in race or ethnicity but was not told how to permissibly do so, and we are of the opinion that, without more context, such an

---

[7] This was in addition to the video surveillance footage that showed defendant both inside and outside the Masheratti Lounge.

instruction may do more mischief than good.  When a trial justice tells the jury that they may consider a factor in assessing evidence, we presume they do so. *See Hallenbeck*, 878 A.2d at 1009 ("It is well settled that jury members are presumed to follow the instructions given by a trial justice.") (quoting *State v. Perry*, 770 A.2d 882, 885 (R.I. 2001)).  While we discern no reversible error in this case, simply stating that the jury may consider differences in race and ethnicity without further context for that instruction is not an appropriate charge.[8]

Nevertheless, we have repeatedly made clear "that counsel rather than the trial justice is the appropriate agent to argue to the jury" on such matters. *State v. Andrade*, 544 A.2d 1140, 1143 (R.I. 1988); *see Fenner*, 503 A.2d at 525 ("Counsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibility or lack thereof of a particular witness.").  In the case before us, defense counsel did argue capably and comprehensively in closing that the identification by Fernandez was "completely unreliable" for multiple reasons, including weapon focus, injury, and his exposure to videos taken at the club that night prior to his view of the photographic arrays.  Where, as here, the trial justice instructs the jury that they may consider a factor in their assessment of the evidence

---

[8] In future cases in which cross-racial eyewitness identification is present, such that an instruction is warranted, the trial justice should consult with counsel for both sides to determine the appropriate contextual remarks.

and defense counsel has the opportunity to argue their preferred interpretation in closing argument, our precedent is clear that no more is required.

We have no doubt following our review of the transcript that the instruction on identification given by the trial justice in the case at bar adequately covered the law. *See, e.g.*, *Payette*, 557 A.2d at 74 (approving the decision not to give a requested instruction "based on the rationale that such requested instructions may be worded in a way that is partisan" and holding that "a trial justice is not required to give specific instructions requested by a party so long as the instructions given adequately cover the applicable law"). In declining to instruct the jury in more detail about the science regarding cross-racial identifications, the trial justice properly relied on the law as it existed at that time. *See State v. Ballard*, 439 A.2d 1375, 1387 (R.I. 1982) ("We cannot fault the trial justice for instructing the jury on the law as it existed at that time."). We therefore conclude that there was no error or abuse of discretion in the trial justice's refusal to employ defendant's requested instruction.

### Due Process

The defendant also contends that the trial justice erred in denying his motion to dismiss the state's habitual offender notice as untimely under G.L. 1956 § 12-19-21, violating his due process rights. In so arguing, defendant acknowledges that his position is contrary to prevailing caselaw and asks this Court to overrule our

previous decision interpreting this language in *State v. Peterson*, 722 A.2d 259 (R.I. 1998). For the reasons stated *infra*, we decline to do so.

"We review questions of statutory interpretation *de novo*." *State v. Hazard*, 68 A.3d 479, 485 (R.I. 2013) (brackets omitted) (quoting *Campbell v. State*, 56 A.3d 448, 454 (R.I. 2012)). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Id.* (quoting *Alessi v. Bowen Court Condominium*, 44 A.3d 736, 740 (R.I. 2012)). "When the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Id.* (brackets omitted) (quoting *Alessi*, 44 A.3d at 740). "Additionally, we remain mindful that 'ambiguities in penal statutes must be strictly construed in favor of the party upon whom a penalty is to be imposed.'" *Id.* (brackets omitted) (quoting *State v. Clark*, 974 A.2d 558, 571 (R.I. 2009)).

The habitual offender statute, § 12-19-21, provides in pertinent part:

> "Whenever it appears a person shall be deemed a 'habitual criminal,' the attorney general, within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference, may file with the court a notice specifying that the defendant, upon conviction, is subject to the imposition of an additional sentence in accordance with this section[.]" Section 12-19-21(b).

This Court has previously held that "[t]he policy underlying habitual offender statutes reflects the Legislature's determination that a third or subsequent offense is

more serious than a first or second offense and accordingly should be punishable as such." *State v. Burke*, 811 A.2d 1158, 1167-68 (R.I. 2002) (quoting *State v. Smith*, 766 A.2d 913, 924 (R.I. 2001)). We have also stated that the pretrial notice contemplated in the habitual offender statute "enables a defendant to know the full range of potential punishment he or she faces upon conviction; fundamental fairness and due process require that allegations that would enhance a sentence be made before trial so that the defendant can evaluate his or her options." *Id.* at 1168 (brackets omitted) (quoting *State v. Benak*, 18 P.3d 127, 130-31 (Ariz. Ct. App. 2001)).

Here, defendant was arraigned on July 6, 2017, but his first pretrial conference was not held until September 7, 2017. September 7, 2017 was also when the state filed its habitual offender notice, more than forty-five days after defendant's arraignment. In *Peterson*, this Court held that the language from § 12-19-21, "but in no case later than the date of the pretrial conference," allowed for extensions to the forty-five-day period set forth in the statute.[9] *Peterson*, 722 A.2d at 264-65. In

---

[9] The majority opinion in *State v. Peterson*, 722 A.2d 259 (R.I. 1998), held that "the construction urged by the defendant could lead to results not intended by the Legislature" and would "deprive[ the state] of its statutory right to seek enhanced sentencing merely because a pretrial conference is continued." *Peterson*, 722 A.2d at 265. However, in both a concurring opinion and a dissent, two justices noted that the either/or interpretation of the statute "effectively reads the forty-five-day period right out of the statute." *Peterson*, 722 A.2d at 265 (Flanders, J., concurring); *see Peterson*, 722 A.2d at 267 (Goldberg, J., concurring in part and dissenting in part) ("This interpretation, however, has the anomalous result that the granting of pretrial

the nearly twenty-three years since that opinion, we have adhered to this interpretation of § 12-19-21 in other cases alleging due process violations for untimely notice. *See, e.g.*, *State v. Morris*, 744 A.2d 850, 859 (R.I. 2000) (describing the statutory requirement for timely notice as "given within forty-five days of [the defendant's] arraignment, or at any time before the date of his pretrial conference").

Since our decision in *Peterson*, the statute has not been amended; therefore, our interpretation of it remains unchanged. The defendant has not and cannot argue that he was unduly prejudiced or that his right to due process was truly infringed by the timing of the notice he received. Notice received on the date of the pretrial conference complied with our holding in *Peterson* and advised the defendant of the consequences of a conviction, which is all due process requires. *See Burke*, 811 A.2d at 1168. We note that a filing on the date of the pretrial conference may diminish the merits of the conference, but we leave that issue to the Legislature.

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The papers in this case may be remanded to the Superior Court.

---

conference continuances, which previously were based upon informal procedure and brotherly courtesy, now have significant and substantive consequences for a defendant facing the most punitive weapon in the Attorney General's arsenal.").



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Gregory Hampton-Boyd. |
| **Case Number** | No. 2019-100-C.A.<br>(P1/17-1770AG) |
| **Date Opinion Filed** | June 28, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General<br>For Defendant:<br><br>Brett V. Beaubien, Esq. |

SU-CMS-02A (revised June 2020)